On today's docket, we have cause number 23-20596, United States of America v. Martinez and Lightner. Is the appellant ready to proceed? You may. I would like to point out on my sufficiency argument a few things. One, Dr. Lightner testified and clearly stated there was no espiritual agreement. My client did not participate, nor did my client act as an office manager over the medical staff and didn't write prescriptions. Michael Edwards testified, and Michael Edwards specifically was asked if there was a conspiratorial agreement to sell or dispense prescriptions for drugs. He said no on many occasions. He said the agreement was to reserve spots, which meant to cut in line so he could see the doctor or the clients he brought in could see the doctor at an earlier time than was scheduled. There is no evidence of any contact between my client and Dr. Lightner regarding drugs. And Dr. Lightner is the only conspirator in this case other than my client. There were no unnamed conspirators. So the only eyewitnesses testified there was no agreement. The other office managers like Ms. Tamata testified there was very little contact between Dr. Lightner and my client. Finally, the Jomori search, the search of the premises, recovered telephones, computers belonging to both parties, and there were no communications of any kind. Numerous were recovered. None indicated there was a conspiratorial agreement of any kind between the two. Basically, what the government tried to show is that a video, a nefarious, allegedly nefarious video between Michael Edwards and my client, where my client was shown instructing Mr. Edwards about applications, that that was a crucial piece of evidence. It was not evidence related to a conspiratorial agreement to dispense drugs. That was part of the agreement to cut in line. That's why the $400 were paid. That's what Mr. Edwards testified to. And he said that once my client got the $400 and gave Mr. Edwards the appointment, that's it. And my client had nothing to do with him anymore. And so it may look nefarious and was presented that way to the jury, and that's the interpretation the government gives to it. However, it clearly shows that it's consistent with what Mr. Edwards testified to. There was only an agreement to cut in line. Now, they tried to show evidence of receiving cash payments that somehow he was a manager, my client was a manager of the office, dealt with unruly crowds. Those, all of those things, all of those circumstances deal with the employment responsibilities of a client. What the government tried to do was conflate the employment relationship between Dr. Leitner and my client and convert that into a conspiratorial agreement of drugs. Everything he was doing, my client was under the instruction of the doctor. That's part of his job duties, to see clients, to accept cash payments, not to question how the clients look or act. He's supposed to do that. That's what everyone else did at the front office. He's not the only one that did that. And he wasn't the manager. Far from it. Dr. Leitner testified he was the final say. And Ms. Tran, a nurse practitioner, was the head of the medical staff. There's evidence that Melissa Martinez, the wife of Dr. Leitner, might have had some authority. Dr. Leitner testified Samantha was the office manager, his daughter. And my client really was the office coordinator, according to Dr. Leitner, and did not have any dealings, very little dealings, with the medical staff. He wasn't capable of issuing prescriptions. Not only did he not have the capacity, he didn't have access to the prescription apparatus that only the doctor and Jackie Tran had. So my client ---- Didn't he advise people on what to say, how to complete the questionnaire with regard to their visit with the doctor, so that they could obtain prescriptions? Yes, he did. There's evidence of that. But what he was doing is making sure that they got the appointment. The doctor, he wanted to make sure, by doing that, the doctor saw him. Well, when you advise people on what the nature of their complaint should be, what they should say is bothering them, that's beyond just making an appointment, isn't it? Well, Your Honor, you have to recall, I mean, I think what the government did in that situation is take it out of context. He's already filled out applications. He's gone to the hospital before. They're aware of his medical history already. And he's commenting on that previously discussed medical situation. It's an ongoing relationship he has with the hospital. That's an isolated event, but it's really the government took it out of context. But his main concern was making sure he got the appointment. It doesn't necessarily mean my client wanted him to get the drugs. He left that up to the doctor and the medical staff that he referred to. And I'll show you one of the reasons is that look at the way he reacted on the video. He looked surprised when he asked for the drugs. He didn't get the approval for the drugs he wanted. He said the doctor doesn't prescribe that. And he goes, what do you mean about those drugs? It looks very clearly on the video that he was not aware that that conversation was going to take that avenue. So that would indicate that it wasn't for the drugs or anything to do with the drugs based on his reaction on that video. I guess my overarching concern is you're making an argument about the sufficiency of the evidence. Yes, sir. The jury heard all of that, including the argument you're making now. Isn't that right? Didn't the jury hear all of that? Yes, sir. And despite that, the jury found him guilty. I'm sorry, sir? I said, and despite hearing all of that, the jury found him guilty. Well, Your Honor, I think they put yes, that's true. I think one of the problems was that they used that video and it had more of an irrational effect. It was a very impactful demonstration, piece of evidence. Well, they also heard that your client's passport was found in Dr. Leitner's truck, didn't they? Yes. Yes, but that's part of his duties. He's supposed to be taking that money as proceeds from the hospital. He's got the passport. I don't know what the passport is for. It could be for cashing checks that were given to the doctor. I don't know. But he had that in the truck. That is correct. But he was with the doctor, and that's part of his job duties. That's related to your client. No, I'm not. It is, then. Yes, it is. No, we're not related. All right. Thank you. Good morning. May it please the Court. My name is Ronald Chapman. I represent Dr. Oscar Leitner, the appellant in this case. This case concerns the destruction of medical records that were stored on a medical record database, leaving Dr. Leitner defenseless to the charges against him, to the evidence, as well as to the sentencing guidelines that were imposed in this case. I do not intend to address the sentencing arguments today. I feel like the record is complete. However, I'm certainly willing to entertain any questions the Court may have related to our very important sentencing arguments. But with that, I'd like to turn specifically and address the record destruction issue. The database that Dr. Leitner kept constituted all of his records from 2012 to 2017. The government maintains that they did not destroy the database, and, in fact, it was produced back to Dr. Leitner. There's one issue I'd like to distinguish for oral argument here, and that is that the information returned back to Dr. Leitner was not his database of medical records, but essentially taking all of his medical records and throwing them up in the air and playing a game of 52-part pick. Mr. Chapman, how are the e-clinical files relevant? They certainly were relevant, first and foremost, because any patients that were patients of Jomori, many of them were also patients of Dr. Leitner between 2012 and 2017, longstanding patients, which means— But doesn't the record show that these files had to do with the Laredo facility? Yes. Patients of Dr. Leitner from other facilities came to see him at Jomori clinics in various locations, the two locations that they had. But didn't the charges in this case only concern the Houston facility? Many of those patients were previously patients of Dr. Leitner, which means their MRI, their X-ray, their prior documentation, the reason for establishing pain treatment was included in those e-clinical works records that Dr. Leitner was deprived from looking at. Well, but the records from both facilities?  Many of the patients saw Dr. Leitner wherever they were able to get in to see him, which means that as patients who saw him— You're saying in Laredo and in Houston. That's correct. Many patients saw him in Laredo and in Houston. That's correct, Your Honor. Yeah. Patients went to various locations to see Dr. Leitner. And what I mean by that is there were patients who were previously treated by him in different locations, and they would see him in either Laredo or Houston. So the prior records were not available to Dr. Leitner. But— No, Your Honor. The records were not obtained. And what I was mentioning earlier is that essentially what was given back to Dr. Leitner was not the database of records, the view that he has as a physician, but rather a jumbled mess that he could not make sense of. The government sent those records to e-clinical works to see if they could reconstruct the database. They were unable to do so. Dr. Leitner hired his own IT professionals before filing a motion related to spoilation. They were unable to construct the database. There was a motion, a pretrial motion in limine, asking for spoilation. That motion is included in the record that was litigated by Dr. Leitner's counsel, and under the case law in this circuit, that written motion is enough to preserve that argument and request the spoilation instruction or request that that, in essence, goes to the jury. I believe that there was a request that the spoilation issue be instructed on or at least go to the jury. I can't remember the specific phrase that was used. Well, I think that we consider that a request for a sanction, Your Honor, an instruction, an adverse inference instruction that would be given to the jury preventing this. The other reason, Your Honor, if you had a question, I'm happy to answer. Well, I mean, I think you answered it. What you're talking about is an adverse inference instruction, which you contend is tantamount to a sanction. I probably view it a little bit differently, but an adverse inference instruction does help you, and you're saying you would deny that instruction. We requested that instruction. And it was denied. It was denied. And the court prevented any mention of the destroyed records to the jury at all, which means the government could put up evidence that 97 percent of the patients received the same thing, only looking at controlled substance prescriptions, but prevented Dr. Leitner from bringing in a busload of records related to all of his other treatment. There's another thing that the jury didn't get to hear. I recall the court's earlier question to co-counsel about what the jury heard in sufficiency, and I think Holly Kaldek's testimony is something the jury was not able to hear the appropriate way. This witness was an anti-opiate advocate getting on the witness stand, blaming Dr. Leitner for every evil that had been caused in her life, despite the fact that she admittedly saw him for pain treatment. Now, when Ms. Kaldek got on the stand, she cried. She talked about broken teeth. She said Dr. Leitner informed her to chew her pills that she received, which was such an outlandish claim when it was made. And then, of course, the government, having previously requested her prescription information, found out that she'd actually been on opiates up to one month prior to her testimony on the witness stand. Dr. Leitner requested that the government rectify that, which is their burden to do when there is false testimony that has gone before the jury. The government did not do so. The judge did not order any sanction whatsoever, including striking that witness's testimony. And what exactly was false about her testimony? She said that she had to go to Colorado in order to leave the abyss of her addiction. She claimed on the witness stand that she went to Colorado essentially to get clean. In fact, when defense counsel, Dr. Leitner's counsel, explored that a bit more, there was an objection that was sustained preventing him from even exploring that issue. And we find later on that the statement that she was off drugs, that she left Dr. Leitner's practice to go to Colorado to get off drugs completely, we found that that was completely false and completely perjured. And Dr. Leitner was not given the opportunity to have that stricken or have her put back on the stand. Well, I guess I thought what you found was that she had a prescription field for some medication after she got to Colorado. By her declaration that she went there to be clean and soap. Correct, correct. Multiple prescriptions, including an even more powerful drug, oxycodone, that she received while she was in Colorado. Her statements about going to Colorado to get clean were incorrect, false, and perjured. And that was not rectified. And in fact, defense counsel was prevented from even exploring that while she was on the stand at the time. This case would be completely different if Ms. Caldeck, and I see my time is up. Thank you very much. Ms. Park. Thank you, counsel. Good morning, Your Honor. May it please the Court, Natasha Harnwell Davis on behalf of the United States. Unless the Court prefers otherwise, I intend to start with the sufficiency claim and then turn to the spoliation in Ms. Caldeck's testimony. There was sufficient evidence for a rational jury to find Martinez guilty on both the conspiracy count and the substantive count. Viewing the evidence in the light most favorable to the government, and abiding by the jury's credibility determinations, particularly as to Dr. Leitner's testimony, there was sufficient evidence. In particular, I'd like to call this Court's attention to the videos with Mr. Edwards, where Martinez expresses knowledge of Dr. Leitner's prescribing practices. He uses phrases like, I know. He tells Edwards how to use a loophole to get a prescription for carisoprodol. He actually reviews Mr. Edwards' paperwork and tells him to modify his symptoms in order to get a prescription. He also uses the phrase that there's legitimate stuff as of records and stuff like that, implying that he's aware that aspects of this clinic are illegitimate. He tells Edwards how to cheat on a urine screen by taking several of the drugs three to four days before, and he tells Edwards that Dr. Leitner does not care if there are illegal substances present in the urine screen, that he will still get a prescription for a controlled substance. Does all of that evidence go to count three? It all goes to count three. It also goes to the conspiracy count, so it's kind of a multipurpose witness piece of evidence. There are other aspects of the record that I'd like to highlight, including the existence of the runners who are bringing patients into the clinic. That's consistent with this court's case law like ODI, where the existence of runners indicates that this is not a legitimate medical clinic. He is texting with one of the runners. You can see that in a photograph of his phone. He is taking cash from patients who appear unable to afford large cash payments. He is working with patients who appear inebriated. There is a significant lack of medical assistance. Tell me how a person appears to be unable to afford something. The testimony from the medical assistants was that not just several, many of the patients appeared to be homeless. In fact, Edwards himself directly tells Martinez, I'm bringing people from a homeless shelter. Is that going to be a problem? They have their Texas IDs. And Martina says, that's not a problem. As long as they have their Texas IDs and their cash, that's all I'm worried about. The other aspects of the record include the startling lack of medical supplies in the clinic itself. So if you go look at the record and look at the photographs of the cabinets, they are bare. There is not equipment that you would expect to see at a place like a family practice. Dr. Leitner installed bulletproof glass in this clinic, which was different from the two other clinic, the family practice clinics in the same building. He also hired a guard and he had cameras that were streaming to his office. The price for the prescriptions varied based on the, excuse me, the price for the appointment varied based on the number of prescriptions that Dr. Leitner wrote. So it was an additional $50 for another prescription. That information comes from the email from Melissa Martinez, who was Dr. Leitner's wife and Mr. Martinez's mother. And additionally, the family practice patients paid only $50. So taking all of that evidence together, there was more than ample evidence for the jury to find Mr. Martinez guilty of both the conspiracy and the substantive count. Unless the court has questions on the sufficiency claim, I intend to move to Dr. Leitner's claims. Starting with the spoliation claim, this claim was waived in the district court when at page 9232 of Dr. Leitner's record, he said, our IT expert is still going through the drive, but I don't think it's an issue for trial anymore. That was an affirmative statement that was withdrawing his prior complaint, letting the court know, I don't think this is an issue for trial anymore. Even if we . . . I don't think what is an issue. He didn't think that the access to the drive was an issue anymore. I can read the full sentence again. Our IT expert is still going through the drive, but I don't think it's an issue for this trial anymore. And so it refers to his spoliation claim? That's my understanding of the record, yes, which would indicate that he waived it before the district court. Notwithstanding the motion in limine? Right, because that withdrawal came after the motion in limine. So sequencing, there was the motion in limine. I admit that brought it to the attention of the district court. In that sense, it's preserved. But he then makes a statement at the district court that says, this is no longer an issue for trial. And at that moment, it is waived and withdrawn from this court's consideration. Was that argued against? Excuse me? The witness counsel argued that he was wrong in making that statement. In his brief on appeal, he indicates that he does not believe it was waivered because he subsequently renewed it. But if you go look at the record where he's talking about the subsequent renewal, that is a conversation about the government's motion in limine to suppress good character evidence. It doesn't alert the district court that he's renewing his spoliation claim. So there is, like eClinical does come up later in the record, but it's not enough to alert the court that, hey, this is about my spoliation claim as opposed to admitting patients from other practices. The things, like there are three things about this claim that are very important for the court to understand. So first is the actual physical object and the files at issue. So there's first this physical device. It's a Dell computer. You could think of it as a desktop computer that the government seizes and then no one disputes that it returns. In the course of seizing it, it images that computer. It makes bit-for-bit copies of the computer. It also turns back those bit-for-bit copies. So that means it turns back the evidence that Dr. Leitner needs back to Dr. Leitner, and it does so several times. In the course of reviewing the images for trial, the technician determined that those files were last modified in 2016. So this brings me to my second point. These files were well outside the time frame of the superseding indictment. Dr. Leitner himself in a sworn affidavit says that he stopped using eClinical in February 2017, and that's consistent with what the government technician found, which is that these files were last modified in 2016, indicating that he didn't open them. So the same way that you or I on a desktop computer, if you go look at your files, you can see a modified date. That indicates kind of the last time you opened it and maybe changed something in it, viewed it, and then closed it. The fact that these files were last modified in 2016 indicates that Dr. Leitner was not using them. That's also, as I mentioned, consistent with his sworn affidavit in the district court. The third thing to emphasize is that these files came from practices that were not Jomori. They were from places called Renew, and they were from Laredo Urgent Care. There has been a lot of confusion, I think, in the record about patients coming from these other practices to Jomori. The record doesn't indicate that Dr. Leitner was using the e-clinical files to treat patients at Jomori. That evidence just simply does not exist in the record. In terms of the aspects that has to be proven for spoliation, so turning now a little bit more to a legal argument, the district court did not clearly err when it found that the government had not acted in bad faith and that the government had not destroyed the files. That's at page 9688 of Dr. Leitner's record where the court says, I don't see any basis other than this technical difficulty to believe that the government has either failed to provide what it imaged following the seizure or that it had deleted or altered the contents. It wraps up with saying, without any kind of finding that there was wrongful withholding or failure to produce the information that is contained on these computers. So having met neither condition of a spoliation claim that the files were destroyed or that it was done in bad faith, there is no merit to this argument. So you're saying everything the government seized, it gave back. It gave back. And in terms, I guess I should briefly address this sense that there was this 52 pickup component that the files weren't turned over in an order that Dr. Leitner was used to. Dr. Leitner said that he could access the files. He says that at page 9232 where he says, our IT expert is still going through the drive. He says it at page 391 where he says, the plaintiff would have to go through a complicated virtualization process to access any information. And he says it again at 9526 where he says that there's a utility that can access the restored images where they claim Dr. Leitner can simply use that utility to access the files. The issue is that we don't have a working database. I'm paraphrasing a little, that Dr. Leitner used for almost eight years. So the fact that Dr. Leitner had to go through additional steps to access the image data for trial preparation does not indicate that the government met the standard of destroying evidence. The fact is that the government actually preserved this evidence. We don't know what condition the database was in when the government seized it, in part because the record indicates that it was last opened in 2016. So it would be similar to having a car where someone says, you've taken my car, it doesn't work. I last used it several years ago. And in that case, there might be a number of reasons why a car doesn't work, including that the battery died. But that wouldn't be any wrongdoing on the part of the government. Turning now to, unless the court has further questions on spoliation, I intend to address Ms. Kadlik's testimony. The district court was well within its discretion to allow the parties to stipulate to the prescriptions that Ms. Kadlik received and allow the parties to argue the case to the jury. The important component of this argument is that the jury heard the relevant information to assess Kadlik's credibility. Her credibility is an issue of weight, not admissibility, and Dr. Leitner was able to argue the prescriptions to the jury in closing, which you can see at page 1571 of the record. Dr. Leitner never asked to recall Ms. Kadlik, though he was certainly free to do so. Now, when you say argue the prescriptions, you're talking about the one Dr. Leitner prescriptions he wrote?  Thank you for letting me clarify. He was able to argue the Colorado prescription. All right. Yes. So in closing argument, he distinctly refers to, these are the prescriptions that Ms. Kadlik received in Colorado. So he was able to make that case to the jury. The jury heard that stipulation. He never asked to recall Ms. Kadlik, though he certainly could have done so. So to the extent that on appeal he's now saying, I would have cross-examined her about this or about that, that's the wrong court to be bringing that claim to. He should have been raising that in the district court and saying, this is my desired remedy for the problem. Was there any confirmation that she used the drugs that were prescribed in Colorado? No, Your Honor. There is no indication that she actually took the drugs. The only indication is that she filled the prescriptions. I also want to note that the prescriptions are different than what Dr. Leitner, several of the prescriptions are different from what Dr. Leitner was prescribing her. Therefore, a smaller quantity of pills, at least one of them is at a lower strength than what Dr. Leitner was prescribing. There's no carisoprodol, which goes by the brand name of Soma, in those prescriptions. They're spaced out much further. So there's no indication that she was actually taking these. We don't know why she received the prescriptions. But I think the important thing to remember here is that Dr. Leitner could have recalled Ms. Kadlik at the time. Instead, he requested that the court strike her entire testimony, which would have removed it completely from consideration of the jury, or for the stipulation, he did in fact receive the stipulation. If he even had recalled her and was cross-examining her about her taking the prescriptions, the information contained in the stipulation, the actual quantities of prescription and the nature of the drugs, would not have been admissible because it would have been collateral for an impeachment. So he actually got more information before the jury by using the stipulation. Even if this court disagrees with me... The upshot of the stipulation was just that she had those prescriptions filled in Colorado. Yes. So the stipulation itself lists all of the prescriptions, with the strength, the type of drug, the date it was prescribed, and I believe the date it was filled, yes. And then it says that these particular types of medications are opiates or benzodiazepines, that the PMP program shows only that the prescriptions for these controlled substances were written by a physician and dispensed at a pharmacy. The data does not reflect whether a person has taken or consumed controlled substances. Dr. Leitner agreed to that stipulation, so to the extent that he's now saying the stipulation should have contained information that she actually took the drugs, that's, one, not factually supported, and two, not an argument that he made in the district court. Even if this court disagrees with me on this issue, the correct remedy would be a new trial, not to vacate his convictions. Unless the court has any questions about sentencing, I ask that this court affirm both Mr. Martinez and Dr. Leitner's convictions. Thank you, counsel. Mr. Martinez, any rebuttal? Please, Your Court. I'd like to address the circumstance where my client is discussing with Michael Edwards the application. And there's two things I'd like to address to bring it to the Court. One is that we can't really take what he talked to you. When he discussed with Michael Edwards, he can't take it to face value because he's playing a ruse. He's just trying to get the money to reserve the spot. He's not concerned with whether or not Edwards gets the drugs or not. He refers that to the medical staff and lets them, in their judgment, determine whether he gets the drugs or not. Once he refers them, he gets the $400. So it's not admirable that my client is doing something behind the doctor's back and making $400 to reserve spots. That is correct. But it's not for the drugs. It's for the $400 to reserve the spots. And afterwards, he leaves it up to the doctor. The second thing I'd like to point out is that these parties had, according to the government, a pre-existing relationship. They both knew what they were there for, according to the government. They were in an isolated place. No one's discussing, no one's hearing anything. Mr. Edwards is trying to get evidence to incriminate my client. It just seems to me that he would have been more specific. He would have mentioned the doctor's role. He would have mentioned prior dealings. He would have talked about the illegal drugs more often. So that way, we would know for sure what this was about. Yet he intentionally kept it vague. Let the government then give their interpretation, perhaps a reasonable interpretation, but one of many. And they wouldn't have blown open the investigation because they both knew what was going on already. And no one was listening. No one was privy to it. So it's a small wonder why he wasn't more specific, and we could have cleared this up at that point. And therefore, that, along with the surprised look of my client when Edwards asked for the drugs and he said, what do you mean? And ultimately, he didn't get the drugs. Perhaps later he did, but not from my client, at least at that time. Thank you very much. Thank you. Mr. Chapman. Thank you. I'd just like to briefly clarify two issues. First, with respect to spoilation, a motion in limine was filed. United States versus Medina indicates there is no requirement to renew after that. The government's interpretation of it does not qualify as a knowing and voluntary waiver. It is important for this court to uphold that in order for a waiver to occur, it must be knowing and it must be intentional. That's what the case law specifically says. Interpretation of it certainly does not qualify. With respect to the government's statement about Dr. Leitner not getting the records the way he wants, this is a very important distinction. Imagine if you take a spreadsheet of complicated financial information and you take all the numbers in it and you jumble them up. It's no longer a spreadsheet of complicated financial information. That's what happened to Dr. Leitner's records. It's not that he couldn't access them the way that they were supposed to be or that he was used to. It's that he could make no medical use out of all of his patient records from 2012 to 2017, which included treatment records related to patients who were seen at Jomori, and that is very important to distinguish. With respect to Ms. Kaldek's testimony, the government continues to say that Dr. Leitner did not recall her. There is no burden to recall a witness where their testimony has been demonstrated as false. Recall, the government received her controlled substance prescription records after she testified, which means they put her on the stand after requesting records, but before receiving them. After requesting the records, but before receiving them. They bear the burden of the error in this case of allowing her to make a statement about going to Colorado for recovery, despite the fact that they later learned that testimony was false. Yes. They had requested the information from the government. The government said that they'd requested it multiple times. They said they didn't have it. She went on the stand anyway. The ability to recall a witness from Colorado after she's left the witness stand mid-trial is a huge burden to put on the defense, when in reality it is the government's responsibility to have candor to the court as well as the jury and make sure that truthful information gets before the jury. This court... You're not suggesting that the government knew it was false at the time she took the witness stand? The government knew it was false when they received the records, certainly. I don't think they had enough information to know at that time, but they knew that it was false when they received the new prescription information. They knew that what was false? What are you saying? That her statement about recovering in Colorado, about leaving the abyss that she was in, was false when they received the records after she testified. Before she testified, I think getting into that territory was somewhat reckless when they didn't have any prescription history despite the fact that they'd requested it. But I won't go so far as to say they knew it was false. And with that, my time is up. Thank you. All right. Thank you, counsel. The court will take this matter under advisement, and we are adjourned.